UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| CHRISTY L. LONIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:13CV32 RWS |
| | ) (TIA) |
| CAROLYN W. COLVIN, | ) |
| ACTING COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**

This matter is before the Court under 42 U.S.C. § 1383(c)(3) for judicial review of the denial of Plaintiff's application for Supplemental Security Income benefits under Title XVI of the Social Security Act. The case was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b).

**I. Procedural History**

On September 23, 2010, Plaintiff protectively filed an application for Supplemental Security Income alleging disability beginning July 10, 2010, which Plaintiff later amended to July 12, 2010. (Tr. 21, 126-33, 141) Plaintiff claimed that she was unable to work due to degenerative disc disease, bulging disc, pinched nerve and nerve damage, high blood pressure, asthma, and no antihistimines. (Tr. 76) The application was denied initially on November 29, 2010, after which Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 74-80, 83-85) On November 14, 2011, Plaintiff testified at a hearing before the ALJ. (Tr. 34-66) In a decision dated December 22, 2011, the ALJ found that Plaintiff had not been under a disability since September 23, 2010, the date the application was filed. (Tr. 21-29) On January

28, 2013, the Appeals Council denied Plaintiff's request for review. (Tr. 1-4) Thus, the decision of the Appeals Council stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel. At the outset, counsel made an opening statement, asserting that Plaintiff was disabled and reduced to less than sedentary work due to severe and disabling back pain, diagnosed as degenerative disc disease, arthritis, bulging disc, and nerve damage. This impairment caused a high frequency of pain, the need to miss many days of work a month, and the need to elevate her feet a couple hours a day. The ALJ then questioned the Plaintiff, who testified that she lived with her husband and four children, ages 4, 8, 11, and 13. She also was expecting her fifth child. Her husband worked during the day, and Plaintiff's mother and two older daughters helped take care of the younger children and household chores. Plaintiff's mother helped with the cooking and housework, and she drove Plaintiff and the children to appointments. (Tr. 39-42)

Plaintiff testified that she was 33 years old and finished the 10th grade. She had no vocational training or professional license. Her last job was as a home health care worker. She described her job as cleaning, cooking, and helping patients bathe. Plaintiff worked between 20 and 40 hours a week and usually retained the same clientele. She last performed that job in July of 2007 after working about 7 months. She quit because she was pregnant and experiencing premature labor. Plaintiff further testified that she first applied for social security disability in September 2010, three years after she stopped working. She stated that her health issues began in July 2010, when she got up from the couch and felt pain from her back to her feet. Plaintiff had been in constant pain ever since. She stated that the pain was in the lower part of her back, and it

radiated down her right side to her toes.  She experienced back pain about 50 percent of the time; most of her pain was in her leg and foot.  Pain was brought on by walking, driving, sitting in a car, sitting in a chair too long, and laying down for too long.  Plaintiff testified that she could stand or walk around for about 30 minutes before her back and right side began to bother her.  In addition, she stated she could sit for 30 minutes to an hour before needing to get up.  (Tr. 42-46)

Plaintiff further stated that she would try different positions to relieve the pain.  While no position took the pain away completely, laying on her left side with a pillow between her legs helped.  Plaintiff lay down of and on throughout the day.  Plaintiff took medication when she was not pregnant, which helped make the pain more tolerable.  However, the medicine made her drowsy.  Plaintiff testified that her doctors indicated her case was one of the worst they had seen and that she had a 50-50 chance that the surgery could make her condition worse.  (Tr. 47-48)

At home, Plaintiff was able to prepare part of supper, wash a few dishes, and clean things off the table.  Some days she was unable to do anything.  Plaintiff only lifted five pounds, which was the weight limitation advised by her doctor.  (Tr. 48-49)

Plaintiff's attorney also questioned her about her daily activities.  Plaintiff explained that on a good day, she could do a handful of dishes or clear the table if it was not full of items.  On a bad day, she could merely switch between laying and sitting.  Her children did the cooking and cleaning when Plaintiff's mom or husband were unavailable.  Her mother visited daily and helped with the kids, housework, cooking, and errands.  Aside from laying on her side, Plaintiff sat in a recliner for relief.  Plaintiff further stated that she had about five good days during the month, and 15 to 20 days were so bad that she could not do anything at all.  She testified that she would be laid up for two or three days after driving to the hearing and constantly sitting.  She specified that

her knees to her toes would be swollen, and the pain in her back would radiate all the way down. Although Plaintiff experienced this pain before she was pregnant, she testified that pregnancy worsened the pain. She worried about her ability to lift her baby. Plaintiff stated that she had problems bending; however, she could pick up something from a standing position and carry it, so long as it wasn't heavy. (Tr. 49-53)

With regard to medications, Plaintiff testified that before she was pregnant she took Valium, Vicodin, ibuprofen, and Neurontin. The medications did not take the pain away entirely. When Plaintiff sat in the recliner, she put the seat halfway back and kept her feet on the foot rest. She sat in that position about three hours a day, and she only got out of the chair to move to a different position. Plaintiff woke up several times a night to change positions or get up for awhile and try sleeping on the couch or recliner. Plaintiff further testified that she decided against back surgery because she did not want to feel worse. She had medical coverage through Medicaid. Plaintiff described the pain in her leg and foot as numbness, pins and needles, and cramping. She had problems wearing shoes and socks were her foot was swollen. Doctors advised her to elevate her feet to help with the swelling. When she drove a long distance on one occasion, her foot swelled, and the swelling did not subside for three or four days. (Tr. 53-58)

Plaintiff stated that she did not go out of the house very often. She went to the grocery store a couple times a week just to get a few things. Her mother did the main grocery shopping. Her ability to carry the groceries out the store depended on the items she purchased. Plaintiff testified that because she had so much trouble caring for her children and her home, she was unable to go outside the home and work. (Tr. 58-59)

Denise Waddell, a vocational expert ("VE"), also testified at the hearing. The VE testified

4

that Plaintiff's work history did not contain any jobs that would allow a sit/stand option. The ALJ then asked her to assume a hypothetical individual age 33 with limited education. The person could lift and/or carry 10 pounds occasionally and five pounds frequently. She could walk for a total of two hours during an eight-hour workday and needed to alternate between sitting and standing throughout the workday. In addition, the individual could climb ramps and stairs for no more than two hours in an eight-hour workday. She was unable to climb ladders, ropes, or scaffolds; could occasionally stoop, kneel, and crouch; was unable to crawl; and needed to avoid hazards such as dangerous machinery or unprotected heights. In light of this hypothetical, the VE testified that the individual could perform work at the sedentary level, including jobs as a wire wrapper, document preparer, and production checker. (Tr. 59-62)

For the second hypothetical, the ALJ asked the VE to assume the first hypothetical with the additional limitation of lifting no more than five pounds. With this change, the VE testified that the jobs mentioned previously could not be performed. In addition, the individual could perform no other unskilled occupation. The ALJ's third hypothetical included the first hypothetical, but not the second, and added the need to take additional, unscheduled breaks lasting 15 minutes at a time, three to four times a day. Given this additional limitation, the VE testified that the individual could not perform the three jobs cited or any job in the national economy. (Tr. 62-63)

Plaintiff's counsel also questioned the VE about her tesimony. When asked whether the sit/stand option was at will, the VE stated that alternating between sitting and standing at will did not have an adverse affect on the ability to perform the three jobs mentioned. However, if the person needed to stand and step away from the work bench, then that would adversely affect her

5

ability to perform the job. Counsel then asked whether the jobs would still be available to a person who was absent twice a month. The VE answered that the jobs would not be available because employers generally tolerate only one absence per month. Counsel also questioned the VE regarding reduced concentration due to pain, causing the person to be off-task up to 20 percent of the day. In light of this limitation, the VE testified that no jobs would be available. (Tr. 63-65)

Plaintiff completed a Function Report – Adult on October 23, 2010. She described a typical day as waking up and taking medication; taking a shower and getting dressed with help; laying, sitting, and walking for a few minutes at a time and a few times a day; helping her kids straighten up the house or cook supper two or three times a week; sitting down during the evening; and going to bed. She stated that she was previously a very busy mother with four kids and was able to help with homework, cooking, cleaning, running errands, kids' activities, and yard work. Her conditions affected her sleep due to pain, and she had trouble taking care of her personal needs. Plaintiff seldom prepared meals but was sometimes able to make sandwiches, cook frozen dinners, and help with complete meals. Her family performed most of the house and yard work. She tried to go outside once a day. She could not drive a car but could ride as a passenger. Plaintiff shopped for food and household items two to six times a month; however she could only shop for a few minutes and for a few items. Plaintiff's only hobby was watching TV, although she used to go places with her kids. She did not go anywhere to socialize but was able to visit with people at her house or on the phone. Plaintiff stated that her conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, stair climb, and complete tasks. She could walk 150 feet before needing to rest for 10 minutes. She was able to follow instructions,

get along with others, and handle stress and changes in routine. She was afraid of having surgery. (Tr. 161-68)

### III. Medical Evidence

On July 12, 2010, Plaintiff presented to Boone Hospital Emergency Center for complaints of back pain after getting up from the couch. An x-ray of the lumbar spine was normal. However, MRI of the lumbar spine revealed loss of disk height and disk desiccation, as well as a mild central disk protrusion abutting the descending right S1 nerve root. The radiologist assessed change of degenerative disk disease at L5-S1 with a mild central disk protrusion. Plaintiff was prescribed Medrol, Vicodin, and Diazapram and instructed to perform exercises. (Tr. 213-17)

On July 14, 2010, Plaintiff followed up with Rick Bonnette, D.O. Dr. Bonnette noted that Plaintiff appeared to be in discomfort and came into office with the help of a walker. Straight leg raising appeared to be 50 to 60 on the right. She displayed slightly positive contralateral straight leg raising on the left at 90 degrees with pain in the right lower back. She had some tightness in the lumbar paraspinal muscles in her back with some pain in the mid lower lumbar region. Dr. Bonnette was diagnosed low back pain, degenerative lumbar disk disease, and sciatic neuritis of the right leg. He prescribed Valium for muscle spasms and Vicodin for pain. Dr. Bonnette also restricted Plaintiff to no lifting over 10 pounds. (Tr. 246-249)

On July 27, 2010, Plaintiff returned to Dr. Bonnette for complaints of increased low back and right leg pain, with more swelling and pain in her right foot. Dr. Bonnette noted that Plaintiff appeared to be in some discomfort on exam. Lower extremity examination revealed 1+ edema in the right foot; tender to palpation of the foot; and slight discomfort up the calf muscle and along the lateral aspect of the leg. Straight leg test was positive. Examination of the back revealed

tenderness on palpation of the lower lumbar region, especially in the right paraspinal muscles. Dr. Bonnette assessed persistent back pain; sciatic neuritis right leg; and recent development of swelling of right foot, rule out deep venous thrombosis. He planned to send Plaintiff to a specialist after a venous ultrasound was negative for DVT. (Tr. 249-252)

Dr. Bonnette saw Plaintiff again on July 29, 2010, after Plaintiff developed a blister on her left lower back area. Plaintiff was in no acute distress. On exam, Plaintiff displayed swelling in the right foot with some tenderness; positive straight leg raising on the right; and gait with a pronounce limp. Dr. Bonnette assessed blister on the left lower back, which he suspected was a bug bite, and persistent low back pain with radicular right leg pain. He planned to arrange an orthopedic or neurosurgery consult and advised Plaintiff to go home, rest, and elevate her right leg. (Tr. 253-57)

On August 3, 2010, Plaintiff presented to Boone Hospital Emergency Center with complaints of back pain. Plaintiff was prescribed Valium for muscle spasm and Percocet for pain. The examining physician assessed degenerative disc disease and advised Plaintiff to follow up with the orthopedic doctor as scheduled. Plaintiff also received a lumbar epidural steroid injection. (Tr. 208-11)

On August 10, 2010, Dr. John Miles saw Plaintiff for complaints of low back pain with radiation to the right lower extremity and toes. Physical examination revealed positive sitting root test on the right with pain radiating to the right hip. Plaintiff was unable to heel walk, toe walk, or heel to toe walk due to pain and balance discrepancies. Dr. Miles noted tenderness to palpation in the lumbar spine, with no tenderness in the sciatic notch or greater trochanters. Dr. Miles also observed that Plaintiff appeared to be severely guarding and her efforts and to be

hampered by pain. Dr. Miles assessed significant foot pain in an L5 distribution and some significant spondylosis at the 5-1 segment with a retrospondylolisthesis and broad based bulge to the right. She also had positive tension signs. Dr. Miles noted that the examination was complicated by her guarding, resulting in poor assessment of strength in the right lower extremity. Pain in her right was consistent with an L5 radiculopathy, implicating her existing L5 root. Dr. Miles prescribed Vicodin, Darvocet, and Neurontin, and he planned an EMG/NCV study of her right lower extremity. (Tr. 223-24)

Plaintiff returned to Dr. John Miles on August 24, 2010, complaining of pain in the right leg particularly distal to the knees. On examination, Dr. Miles noted some physiological weakness of dorsiflexion on the right side, extensor hallucis longus, and ankle eversion. However, he also noted that the weakness on the right side was mostly due to guarding. Sitting root test was positive on the right to about 45 degrees from full extension. Dr. Miles discussed microdiscectomy at the 5-1 level on the right, including outcomes and complications. (Tr. 220)

Also on August 24, 2010, Plaintiff saw Dr. Jennifer L.K. Clark for right lower extremity electrodiagnostic studies. Plaintiff complained of pain in her low back down to her toes, as well as pain, numbness, and tingling in her foot with weakness in her leg and foot. Physical examination showed 1- muscle stretch reflexes at the patella and absent the Achilles. Dr. Clark had difficulty determining whether Plaintiff was better than 3/5 on either side. Dr. Clark noted decreased sensation in the L4 to S1 distribution, but sensation was normal on the posterior thigh, buttock, and back. Plaintiff got up and moved stiffly, and she was protective of her right foot. EMG of the right lower extremity revealed marked denervation of the tibialis anterior, medial gastroc, extensor hallucis longus, and tensor fascia lata with a normal gluteus medius, normal

9

semitendinosus, and normal L3, L4, and L5 paraspinals. Dr. Clark assessed evidence of a right L5 radiculopathy, although it encompassed L4 through S1. In addition, she noted that muscles outside the sciatic nerve were involved. (Tr. 218, 221-22)

On September 17, 2010, William O. Hopkins, M.D., evaluated Plaintiff for back and right leg pain. Dr. Hopkins noted that the Plaintiff was very uncomfortable, had difficult moving from sitting to standing, and stood forward flexed. Back motion was restricted, but leg pain was not reproduced. Plaintiff displayed extreme hypersensitivity across the dorsal aspect of her right foot which impeded her physical exam. Dr. Hopkins noted extensor compartment weakness on the right leg as well as hamstring weakness. Straight leg raise was extremely restricted. Dr. Hopkins referred the Plaintiff to orthopedic surgeon, Dr. Craig Kuhns. An addendum noted that a selective nerve block could be a reasonable consideration. (Tr. 229-33)

Dr. Craig A. Kuhns evaluated Plaintiff on September 28, 2010 for back pain with lower extremity radiating pain and numbness. Dr. Kuhns noted that Plaintiff was hypersensitive with pain and had dysesthetic pain to touch, as well as weakness in her whole global lower extremity. He also opined that Plaintiff was depressed. Dr. Kuhns recommended a new MRI of Plaintiff's lumbar spine if she could secure Medicaid. He also recommended that she quit smoking and stop using narcotics. (Tr. 226-27)

On October 5, 2010, Plaintiff returned to Dr. Bonnette with ongoing low back pain and radicular right leg pain. Plaintiff sought refills of Vicodin and Valium. Plaintiff mentioned that she was approved for Medicaid insurance. On exam, straight leg raising was positive on the right. Dr. Bonnette noted soreness in the lower lumbar region and some tightness in the right lumbar paraspinal muscles. Dr. Bonnette refilled Plaintiff's pain medications. (Tr. 262-63)

On November 22, 2010, Plaintiff again saw Dr. Bonnette to refill her pain medication for ongoing low back pain and muscle spasms. On exam straight leg raise was questionably positive at 90 degrees on the right. She had some lower back pain in the lumbar region, as well as some tightness in the right lumbar paraspinal muscles. She maintained fair back mobility. Dr. Bonnette refilled her prescriptions, which included Neurontin, Valium, and Vicodin. (Tr. 304-07) Plaintiff returned to Dr. Bonnette on January 12, 2011, complaining of cold symptoms and back pain, for which she sought a refill of Vicodin. The Plaintiff indicated she still had significant pain in her lower back despite some improvement. On exam, straight leg raise was still positive on the right. She had some continued discomfort down the lower lumbar region on the right. Dr. Bonnette refilled her Vicodin prescription. (Tr. 308-11)

On March 2, 2011, Plaintiff again saw Dr. Bonnette for pain medication refills. Plaintiff reported that her low back pain continued to improve, but the pain in her right leg was a little more bothersome. She also mentioned some right leg swelling if she was on her feet for an extended period of time. Dr. Bonnette noted some tightness in the lower lumbar paraspinal muscles, as well as some discomfort on palpation in the lumbar area. Dr. Bonnette refilled Plaintiff's prescriptions for Neurontin and Vicodin. (Tr. 312-15)

On October 25, 2011, Dr. Bonnette completed a Physician's Assessment for Social Security Disability Claim. He diagnosed the Plaintiff with lumbar disk disease and chronic low back pain. He indicated the Plaintiff was under the care of a pain management specialist and an orthopedic clinic. Dr. Bonnette did not know how many hours in an eight-hour work day Plaintiff would need to rest; whether she would require elevation of her feet; whether she would be reliable on a daily basis; or how many absences a month she would require. In addition, he was unable to

assess her ability to do work related activities due to the fact that Plaintiff was pregnant. However, Dr. Bonnette opined that Plaintiff's experience of pain would be so severe that it would interfere with her ability to maintain attention and concentration on a frequent basis. (Tr. 331-32)

## IV. The ALJ's Determination

In a decision dated December 22, 2011, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 23, 2010. Her severe impairment included degenerative disk disease of the spine. However, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 21-24)

After carefully considering the entire record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to lift and/or carry ten pounds occasionally and five pounds frequently; walk for two hours in an eight hour work day; alternate between sitting and standing throughout the work day while performing work tasks; climb ramps and stairs for two hours in a work day; and occasionally stoop, kneel, and crouch. Plaintiff was unable to climb ladders, ropes, and scaffolds; crawl; or be exposed to hazards such as dangerous machinery or unprotected heights. The ALJ further found that Plaintiff had no past relevant work. She was a younger individual on the date she filed her application, and she had limited education. In light of Plaintiff's age, education, work experience, and RFC, the ALJ determined that jobs existed in significant numbers in the national economy that the Plaintiff could perform. Therefore, the ALJ concluded that Plaintiff had not been under a disability, as defined by the Social Security Act, since September 23, 2010, the date she filed her application. (Tr. 24-28)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that she is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir.

1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[1] standards and whether the evidence so contradicts

---

[1]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak 49 F.3d at 1354.

## VI.  Discussion

Plaintiff raises two arguments in her Brief in Support of the Complaint. First, Plaintiff asserts that the ALJ failed to properly consider the opinions of Plaintiff's treating physician. Second, the Plaintiff contends that the ALJ failed to include limited concentration due to pain in the hypothetical question posed to the VE. In response, the Defendant argues that substantial evidence supports the ALJ's credibility assessment. In addition, Defendant maintains that the ALJ properly assessed the medical opinion evidence. Finally, Defendant asserts that the ALJ properly determined Plaintiff's RFC. The undersigned finds that substantial evidence supports the ALJ's determination, and the Commissioner's decision should be affirmed.

### A.  Weight Given to the Treating Physician

Plaintiff argues that the ALJ erred in not giving substantial weight to the opinion of Dr. Bonnette, Plaintiff's treating physician. Defendant asserts that the ALJ properly gave Dr. Bonnette's opinion little weight because the opinion failed to proved a true assessment of Plaintiff's limitations. The Court finds that substantial evidence supports the ALJ's determination.

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted); see also SSR 96-

15

2P, 1996 WL 374188 (July 2, 1996) ("Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."). The ALJ need not give controlling weight to a treating physician's opinion where the physician's treatment notes were inconsistent with the physician's RFC assessment. Goetz v. Barnhart, 182 F. App'x 625, 626 (8th Cir. 2006). Further, "[i]t is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements." Swarnes v. Astrue, Civ. No. 08-5025-KES, 2009 WL 454930, at *11 (D.S.D. Feb. 23, 2009) (citation omitted); see also Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) (finding that the ALJ properly discounted a treating physician's opinion where it consisted of checklist forms, cited no medical evidence, and provided little to no elaboration).

Here, although Dr. Bonnette is Plaintiff's treating physician, the record demonstrates that Dr. Bonnette answered "unknown" to almost all of the questions related to how her impairment affected her ability to function in the work place. Dr. Bonnette attributed his lack of a response to Plaintiff's pregnancy. However, as stated by the ALJ, "[a]lthough a treating physician, Dr. Bonnette's medical opinion does not provide any true assessment of the claimant's limitations. He reports that she experiences back pain, and that she is pregnant, but he does not provide any distinction between the two or provide an assessment on how the claimant is limited." (Tr. 27)

The undersigned agrees that the medical opinion is not supported by any functional assessment or objective findings. Plaintiff argues that the ALJ should have given substantial weight to Dr. Bonnette's statement that pain frequently interfered with Plaintiff's ability to concentrate. This conclusory statement is neither supported by objective evidence, nor is it

16

consistent with Dr. Bonnette's treatment notes indicating gradual improvement. (Tr. 307, 311) Therefore, the Court finds that the ALJ properly assigned limited weight to Dr. Bonnette's assessment. Wildman, 596 F.3d at 964.[2]

### B. Hypothetical Question to the VE

Next, Plaintiff argues that the ALJ failed to include Plaintiff's limited concentration due to pain in the hypothetical question posed to the VE. Defendant, on the other hand, asserts that the hypothetical question was proper because it included all of the limitations the ALJ found credible.

The undersigned agrees that the ALJ posed a proper hypothetical question to the VE and that the VE's testimony that Plaintiff could perform work was substantial evidence in support of the ALJ's determination. "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)). Further, where substantial evidence supports an ALJ's finding that a plaintiff's complaints were not credible, the ALJ may properly exclude those complaints from the hypothetical question. Id.

---

[2] Plaintiff also seems to argue that the ALJ should have re-contacted Dr. Bonnette for additional evidence or clarification. However, the ALJ is not required "'to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.'" Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005) (quoting Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)). Here, although the ALJ noted that Dr. Bonnette's opinion lacked a true assessment of Plaintiff's limitations, the RFC determination reflects Plaintiff's functional limitations based upon the all relevant evidence. Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (citation omitted). The ALJ may rely on facts, observations, and medical conclusions that bear directly on the extent of a plaintiff's ability to function in the work place. Cox v. Astrue, 495 F.3d 614, 620 (8th Cir. 2007). Here, "[t]he ALJ thoroughly discussed the medical records before outlining his RFC determination, which [this Court] conclude[s] is supported by substantial evidence." Gaston v. Astrue, 276 F. App'x 536, 537 (8th Cir. 2008).

In the instant case, the ALJ included only those impairments and limitations that he found credible. The ALJ asked the VE to assume an individual with Plaintiff's age, education, and no past work experience, who could work at a sedentary exertional level. (Tr. 28, 61-62) The ALJ also included those credible physical limitations, such as a sit/stand option while performing tasks; inability to climb, ladders, ropes, and scaffolds; inability to crawl; and inability to be exposed to hazards. (Tr. 24, 61) These limitations are consistent with medical and other evidence in the record and with the ALJ's RFC determination. As stated above, the ALJ properly gave limited weight to Dr. Bonnette's opinion that Plaintiff experienced frequent limited concentration due to pain. Thus, the ALJ was not obligated to include this limitation in the hypothetical. See Robson v. Astrue, 526 F.3d 389, 393 (8th Cir. 2008) (finding the ALJ did not err in excluding treating physician's opinion from the hypothetical where the findings were not supported by objective diagnostic testing).

Therefore, the undersigned finds that "[t]he hypothetical was sufficient because it represented a valid assessment of [Plaintiff's] . . . limitations consistent with the evidence in the record." Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001). Because the hypothetical question contained all of the concrete consequences of Plaintiff's impairments, substantial evidence on the record as a whole supports the VE's testimony, and the ALJ's finding, that Plaintiff could perform work existing in significant numbers in the national economy. Robson, 526 F.3d at 393. Therefore, the undersigned finds that the decision of the Commissioner should be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

      /s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this  15th  day of July, 2014.